UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


MULTNOMAH COUNTY, an existing county
government and a body politic and corporate,

                     Plaintiff,

       v.

ALEX M. AZAR II, in his official capacity as
Secretary, U.S. Department of Health and
Human Services; VALERIE HUBER, in her
official capacity as the Senior Policy Advisor
for the Office of the Assistant Secretary of
Health; and U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

               Defendants.

Case No. 3:18-cv-01015-YY

OPINION AND ORDER


YOU, Magistrate Judge:

      Plaintiff Multnomah County ("the County") has brought this action to enjoin the

administration of the 2018 application and selection process for Teen Pregnancy Prevention

Program ("TPP Program") grants by defendants U.S. Department of Health and Human Services

("HHS"), Secretary Alex M. Azar II, and Senior Policy Advisor Valerie Huber (collectively

"defendants").  Am. Compl. ¶ 1, ECF #28.  The County alleges four claims:  In Count One, the

County asserts that the 2018 Tier 1 Funding Opportunity Announcement ("2018 Tier 1 FOA")

must be vacated under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) ("APA")

because it is not in accordance with law, specifically the Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348, 733 (2018) ("2018 CAA"), the Purpose Statute, 31 U.S.C. § 1301(a), and the Appropriations Clause, Art. I, § 9, cl. 7. *Id.* ¶¶ 97–104. In Count Two, the County claims that under the APA, the 2018 Tier 1 FOA is arbitrary and capricious and defendants have abused their discretion. *Id.* ¶¶ 105–11. Count Three alleges that the 2018 Tier 1 FOA violates the APA in that it is contrary to HHS regulations, specifically 45 C.F.R. § 87.3(l). *Id.* ¶¶ 112–16. Finally, in Count Four, the County asserts that the 2018 Tier 1 FOA is an *ultra vires* action. *Id.* ¶¶ 117–20.

The County has filed a Motion for Preliminary Injunction and Partial Summary Judgment with respect to Counts One, Two, and Four. ECF #29.[1] Defendants have filed a Motion to Dismiss or for Summary Judgment against all counts. ECF #42.

This court has federal question jurisdiction over this action. 28 U.S.C. § 1331. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the County's motion for summary judgment with respect to Counts One and Four is granted, and defendants' motion for summary judgment on those claims is denied. The County's motion for preliminary injunction is denied as moot. The motions for summary judgment on Counts Two and Three are also denied as moot.

## BACKGROUND

Although Congress first became involved with sexual-health education in the early 1900s, the passage of the Adolescent Family Life Act in 1982 provides the necessary context to

---

[1] Due to the large number of briefs and exhibits that have been filed, they are referred to by ECF number instead of name, followed by the page number of the underlying document.

frame the issues here. Pub. L. No. 97–35, 95 Stat. 582 (1981) (codified at 42 U.S.C. § 300z).

From 1982 until 2010, Congress funded "abstinence education" with the purpose of promoting

"abstinence from sexual activity."[2] During this time, Congress funded "educational or

motivational program[s]" that had the "exclusive purpose [of] teaching the social, psychological,

and health gains to be realized by abstaining from sexual activity." 42 U.S.C. § 710(2)(A)

(2000). These programs taught "abstinence from sexual activity outside marriage as the

expected standard for all school age children," and "that sexual activity outside of the context of

marriage is likely to have harmful psychological and physical effects." *Id.* §§ 710(2)(B), (E)

(2000). To date, Congress has continued funding programs that promote abstinence from non-

marital sexual activity. *See* 2018 CAA, 132 Stat. at 733 (appropriating $25 million in FY 2018

for "making competitive grants which exclusively implement education in sexual risk

avoidance"); 42 U.S.C. § 710 (2018 Suppl.) (appropriating $75 million in FY 2018 to Sexual

Risk Avoidance Education Programs under Title V of the Social Security Act).

However, in fiscal year 2010, Congress charted a new course by creating the Teen

Pregnancy Prevention ("TPP") Program. *See* Consolidated Appropriations Act of 2010, Pub. L.

No. 111–117, 123 Stat. 3034, 3253 (2009) ("2010 CAA"); H.R. Rep. No. 111-366, at 1040–41

(2009). Through the TPP Program, Congress appropriated funds toward sexual-health-education

initiatives with evidence of effectiveness, with few restrictions on the underlying subject matter.

Specifically, the 2010 CAA appropriated no less than $110 million "to fund medically accurate

and age appropriate programs that reduce teen pregnancy," no less than $75 million for

---

[2] *See, e.g.*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L.
104–193, 110 Stat. 2105 (1996) (amending Title V of the Social Security Act) (codified at 42
U.S.C. § 710 (effective August 22, 1996 to June 30, 2003)); Welfare Reform Extension Act of
2003, Pub. L. No 108-40, 117 Stat. 836 (amending Title V of the Social Security Act) (codified
at 42 U.S.C. § 710 (effective July 1, 2003 to March 22, 2010)).

"replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors" (known as Tier 1 grants), no less than $25 million for "for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy" (known as Tier 2 grants), and any remainder to "be available for training and technical assistance, evaluation, outreach, and additional program support activities." *Id.* Every year since 2010, including through fiscal year 2018, Congress has appropriated between $100 million and $110 million to the TPP program with the same operative statutory text as the 2010 CAA and the same 75% allocation for replicating programs that have been proven effective through rigorous evaluation and 25% allocation for research to develop additional models and strategies. *Compare* 2010 CAA, 123 Stat. at 3253 *with* 2018 CAA, 132 Stat. at 733.

In tandem with the creation of the TPP Program, HHS has sponsored the "TPP Evidence Review," i.e., an ongoing systematic review of TPP research to identify programs with evidence of effectiveness in reducing teen pregnancy, STIs, and associated sexual risk behaviors. ECF #33-2. Every consolidated appropriations act since 2010 has made funding available to conduct the TPP Evidence Review. *See, e.g.*, 2010 CAA, 123 Stat. at 3253 (appropriating $4,455,000 "to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches"); Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113–235, 128 Stat. 2130, 2483 (2014) (appropriating $6.8 million for the same purpose); 2018 CAA, 132 Stat. at 733 (same). "The TPP Evidence Review is a joint effort sponsored by three divisions within [HHS]: the Office of the Assistant Secretary for Planning and Evaluation, the Family and Youth Services Bureau within the Administration for Children and Families, and the

Office of Adolescent Health within the Office of the Assistant Secretary for Health." ECF #33-25, at 1. The TPP Evidence Review "identifies, assesses, and rates the rigor of program impact studies and describes the strength of evidence supporting different program models. Findings are used to identify program models meeting the criteria for the HHS List of Evidence-Based Teen Pregnancy Prevention Programs." ECF #33-2, at 1. HHS contracts with Mathematica Policy Research ("Mathematica") to conduct the review.

In April 2010, Mathematica published the results of its initial review in which it identified 28 programs proven effective in preventing teen pregnancies, sexually transmitted infections ("STIs"), or sexual risk behaviors. *See* ECF #33-2, at 7–8, 15. At HHS's request, Mathematica has updated its findings five additional times (in April 2012, July 2014, February 2015, April 2016, and April 2018), resulting in the identification of 20 additional programs showing evidence of effectiveness in preventing teen pregnancies, STIs, or sexual risk behaviors. ECF #33-2, at 12; ECF #33-25, at 1 ("the total number of programs meeting the review criteria for evidence of effectiveness is now 48"); Mathematica Policy Research, *Review Protocol Version 5.0* at 1, https://tppevidencereview.aspe.hhs.gov/pdfs/TPPER_Review%20Protocol_v5.pdf.

In 2009, through the Office of Adolescent Health ("OAH"), HHS issued a Tier 1 Funding Opportunity Announcement ("FOA"), soliciting applications for five-year grants for fiscal years 2010 through 2014 ("First Cohort"). *See* ECF #33-3 ("2010 FOA"). In 2014, OAH issued two Tier 1 FOAs, soliciting applications for five-year grants for fiscal years 2015 through 2019 ("Second Cohort"). ECF #33-8 ("2015 Tier 1A FOA"); ECF #33-9 ("2015 Tier 1B FOA"). Under the 2010 Tier 1 FOA, funding was restricted to "evidence-based programs that have been shown to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or

other associated risk factors." ECF #33-3, at 3–4. The 2010 Tier 1 FOA defined "[e]vidence-based program models" to mean "[p]rogram models for which systematic empirical research or evaluation has provided evidence of effectiveness." *Id.* at 44. Applicants could either replicate programs identified as effective by Mathematica's "independent, systematic review of the evidence base," or replicate other programs if they met "a set of stringent criteria," including review by Mathematica "using the same evidence review criteria" it used in its independent review. *Id.* at 6–7. The 2015 Tier 1A and Tier 1B FOAs similarly required that grantees replicate "[p]rograms identified by HHS as having undergone a rigorous evaluation [and] been shown to be effective at preventing teen pregnancies, sexually transmitted infections, and/or sexual risk behaviors." ECF #33-8, at 79; ECF #33-9, at 89.

In 2018, HHS requested "$0.00" or a "decrease of $100,808,000 from the FY 2017" budget for the TPP Program. ECF #33-16, at 6 ("The Budget eliminates the TPP program."). However, Congress declined the invitation to eliminate the TPP Program when it issued the 2018 CAA, retaining the same operative text used in prior consolidated appropriations acts since it created the program. *Compare* 2010 CAA, 123 Stat. at 3253 *with* 2018 CAA, 132 Stat. at 733.

Although the Second Cohort of grants ran through fiscal year 2019, HHS terminated 81 TPP Program grants without explanation on June 30, 2018. In four separate lawsuits, courts held that HHS's actions were unlawful on grounds it violated the APA. *Healthy Teen Network v. Azar*, No. CV CCB-18-468, 2018 WL 1942171, at *7-*8 (D. Md. Apr. 25, 2018), *appeal docketed*, No. 18-1709 (4th Cir. June 26, 2018); *Policy & Research, LLC v. United States Dep't of Health & Human Servs.*, No. 18-CV-00346 (KBJ), 2018 WL 2184449, at *13 (D.D.C. May 11, 2018), *appeal docketed*, No. 18-5190 (D.C. Cir. June 21, 2018); *King Cty. v. Azar*, No. C18-0242-JCC, 2018 WL 2411759, at *7 (W.D. Wash. May 29, 2018), *appeal docketed*, No. 18-

35606 (9th Cir. July 27, 2018); *Healthy Futures of Texas v. Dep't of Health & Human Servs.*, No. 1:18-CV-992 (KBJ), 2018 WL 2471266, at *6 (D.D.C. June 1, 2018). On April 20, 2018, the day after the court in *Policy and Research* orally announced its decision that HHS's actions violated the APA, HHS issued the 2018 Tier 1 FOA. *Healthy Futures*, 2018 WL 2471266, at *6.

In 2015, the County received a $6.25 million, five-year Tier 1B grant as part of the Second Cohort so that it could offer comprehensive sexual education through the Adolescents & Communities Together ("ACT") program. ECF #28, ¶ 86. The County alleges that it plans to compete for a grant under the 2018 Tier 1 FOA. *Id.* ¶ 92. If the County does not obtain some or all of its remaining Second Cohort funding, it plans to use the funds it receives through the 2018 Tier 1 FOA toward sustaining the ACT program. *Id.* If the County is successful in obtaining all of its Second Cohort funding, it would use the funds from the 2018 Tier 1 FOA to expand evidence-based, comprehensive sexual education. *Id.*

Before this court is the question of whether the 2018 Tier 1 FOA issued on April 20, 2018, is lawful.

## DISCUSSION

## I. Consideration of Evidence Outside the Administrative Record

The County has submitted a number of extra-record materials in support of its various arguments. Typically, judicial review of an agency decision is restricted to documents in the administrative record. 5 U.S.C. § 706; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). "When a reviewing court considers evidence that was not before the agency, it inevitably leads the reviewing court to substitute its judgment for that of the agency." *Asarco, Inc. v. U.S. Envtl. Prot. Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980). However, "it is both unrealistic and unwise to 'straightjacket' the reviewing court with the administrative record." *Id.*

It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not. The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters.

*Id.* These conflicting considerations can be resolved:

If the reviewing court finds it necessary to go outside the administrative record, it should consider evidence relevant to the substantive merits of the agency action only for background information . . . or for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision.

*Id.*

The Ninth Circuit has more recently explained that the court may consider extra-record materials (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when the plaintiff makes a showing of agency bad faith. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). "These exceptions are to be narrowly construed, and the party seeking to admit extra-record evidence initially bears the burden of demonstrating that a relevant exception applies." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992–93 (9th Cir. 2014).

The County asserts that the last two exceptions apply—the extra-record materials are necessary to explain technical terms and complex subject matter and to show the agency acted in bad faith. ECF #58, at 12. This court does not have to decide whether those exceptions apply because this matter can be resolved without considering most of the extra-record materials the County has proffered. Moreover, in those instances where this court has considered extra-record documents, it is because the second exception has been satisfied, i.e., HHS relied on them in

making its decision.  For example, while the 2010 and 2015 Tier 1 FOAs are not contained in the administrative record, clearly HHS considered them in making its decision to alter course with the 2018 Tier 1 FOA.  Also, the TPP Evidence Review is referenced repeatedly in the administrative record.  *See*, *e.g.*, Press Release, August 28, 2017, AR000029 (referring to "TPP Program's approved list"); AR003250 (referring to TPP Evidence Review).

## II.    Article III Standing

To establish Article III standing, the County "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements."  *Id.*

Defendants do not assert that the County has failed to satisfy Article III's injury-in-fact and causation requirements.  ECF #42, at 11–12.  Rather, defendants assert that the County's proposed relief—vacating the 2018 Tier 1 FOA—will not redress its alleged injury.  Defendants contend that if this court vacates the 2018 Tier 1 FOA, the matter will have to be remanded back to HHS; however, the appropriation must be used by September 30, 2018, and it will be impossible to draft and promulgate a new FOA, receive applications, and issue new awards by that date.  ECF #42, at 12.  ECF #73, at 11.  Thus, defendants contend, vacating the 2018 Tier 1 FOA will deprive every applicant—including the County—from receiving any funds.  ECF #42, at 12.

Contrary to defendants' contention, redressability does not hinge on whether the 2018 Tier 1 FOA funds will revert to the Treasury on September 30, 2018.  "In general, a federal

agency's budget authority lapses on the last day of the period of which funds were obligated."

*Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (citing 31 U.S.C.

§ 1502(a)). "After that date, any unobligated funds revert to the Treasury." *Id.* (citing 31 U.S.C.

§ 1552(a)(2)). "Nevertheless, it is well settled that federal courts may award appropriated funds

to a successful litigant even after the statutory lapse date if, as here, the suit was initiated on or

before that date." *Id.* (citing *Connecticut v. Schweiker*, 684 F.2d 979, 996–99 (D.C. Cir. 1982),

*cert. denied*, 459 U.S. 1207 (1983)); 31 U.S.C. § 1502(b).[3] That is because "[t]he equity powers

of the courts allow them to take action to preserve the status quo of a dispute and protect their

ability to decide a case properly before them. In such situations, the courts simply suspend the

operation of a lapse provision and extend the term of already existing budget authority." *City of*

*Houston, Tex. v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (citing

*Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 184 (D.C. Cir. 1992)); *see also Schweiker*,

684 F.2d at 997 ("This court has repeatedly reaffirmed the power of courts to order that funds be

held available beyond their statutory lapse date if equity requires.") (citation omitted); *Nat'l*

*Ass'n of Regional Councils v. Costle*, 564 F.2d 583, 588 (D.C. Cir. 1977) ("Decisions that a

court may act to prevent the expiration of a budget authority which has not terminated at the time

suit is filed are completely consistent with the accepted principle that the equity powers of the

---

[3] 31 U.S.C. § 1502(b) states:

> A provision of law requiring that the balance of an appropriation or fund be
> returned to the general fund of the Treasury at the end of a definite period does
> not affect the status of lawsuits or rights of action involving the right to an amount
> payable from the balance.

court allow them to take action to preserve the status quo of a dispute. . . .").[4]  In this case, the court's ability to exercise this equitable power is available because the County filed suit before the appropriation is set to lapse.  *Population Inst.*, 797 F.2d at 1081.

Additionally, the County seeks redress for a "competitive injury."  "[W]hen challenged agency conduct allegedly renders a [competitor] unable to fairly compete for some benefit, that [competitor] has suffered a sufficient 'injury in fact' and has standing."  *Preston v. Heckler*, 734 F.2d 1359, 1365 (9th Cir. 1984).  "[E]conomic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them . . . . This doctrine of 'competitor standing' is grounded in the basic law of economics that increased competition leads to actual injury."  *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 950 (9th Cir. 2017) (citation omitted); *see also Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) ("Because the Guidelines have intensified the competition for a share in a fixed amount of money, the plaintiffs will have to invest more time and resources to craft a successful grant application.  That is an actual, here-and-now injury.").  "The grant competitor is not required to show that it would have received the grant but for the disadvantage it faced. Rather, 'the "injury in fact" is the inability to compete on an equal footing in the bidding process.'"  *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1094 (C.D. Cal. 2018) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)).

---

[4] "The basis for this equitable power is the court preserving existing authority created by Congress rather than the creation of authority."  *Burton v. Thornburgh*, 541 F. Supp. 168, 176 n.16 (E.D. Pa. 1982).

Here, the County contends that "[t]he changed terms of the new FOA have intensified the competition by allowing programs that do not qualify under" the 2018 CAA to apply. ECF #29, at 31. This is sufficient to allege a competitive injury, and vacating the 2018 Tier 1 FOA is likely to redress that injury.[5] *See Hispanic Affairs Project v. Perez*, 206 F. Supp. 3d 348, 371 (D.D.C. 2016) (holding that a competitive-standing plaintiff need only articulate the "basic economic logic" undergirding its claims to demonstrate redressability).

## III. Reviewability Under Administrative Procedures Act

### A. Final Agency Action

"The APA expressly declares itself to be a comprehensive remedial scheme: it states that a 'person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review'. . . and then sets forth the procedures for such review." *Western Radio Serv. Co. v. United States Forest Service*, 578 F.3d 1116, 1122 (9th Cir. 2009) (quoting 5 U.S.C. §§ 702, 704, 706). Judicial review is allowed "so long as the decision challenged represents a 'final agency action for which there is no other adequate remedy in a court.'" *Id*. (quoting *Webster v. Doe*, 486 U.S. 592, 599 (1988)); 5 U.S.C. § 704; *see also Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 n.1 (9th Cir. 1990) ("[F]inality is . . . a jurisdictional requirement.") (citation omitted).

---

[5] Defendants do not argue that the County has failed to establish redressability on the basis that it ultimately may not receive the additional funds it seeks. Indeed, such an argument would lack merit. "[U]nder the 'procedural rights' doctrine, uncertainty regarding whether an agency will stay its course after following proper procedures on remand does not undermine redressability." *Nw. Requirements Utilities v. F.E.R.C.*, 798 F.3d 796, 807 n.8 (9th Cir. 2015) (citing *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014)). To establish standing, "a federal plaintiff must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury." *Beno v. Shalala*, 30 F.3d 1057, 1064 (9th Cir. 1994) (emphasis in original).

For an agency action to be final, it must (1) mark the consummation of the agency's decision-making process and (2) be one by which rights or obligations have been determined, or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Regarding the first prong of the test, finality requires that agency action "must not be of a merely tentative or interlocutory nature." *Id.* at 178. Rather, the action must be the agency's "last word on the matter." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). "As the Supreme Court has stated, the core question is whether the agency has completed its decisionmaking process[] and whether the result of that process is one that will directly affect the parties." *Indus. Customers of Nw. Utilities v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)) (quotation marks and alteration omitted). Courts must ask "whether the action amounts to a definitive statement of the agency's position or has a direct and immediate effect on the day-to-day operations' of the subject party, or if immediate compliance with the terms is expected." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (internal quotation marks and alteration omitted). Importantly, the "finality element must be interpreted in a pragmatic and flexible manner." *Id.* (internal quotation and alteration omitted). "It is the effect of the action and not its label that must be considered." *Id.* at 985 (internal quotation and citations omitted).

With respect to the second prong, legal consequences flow from an agency's decision that prohibits future federal funding. *Arizona State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 391 F. Supp. 2d 800, 802 (D. Ariz. 2005). Legal consequences also flow from an agency's decision to condition grant funding on compliance with the federal government's interpretation of a statute. *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1031–32 (N.D. Cal. 2018).

Defendants contend there has been no final agency action because its issuance of the 2018 Tier 1 FOA is merely the "first step" in the decision-making process to award grants and "[s]everal steps must follow the FOA for a grant to be awarded." ECF #42, at 14. However, while additional steps must be taken to actually award grants, no further steps need to be taken to disqualify applicants such as the County from receiving grants at all. As the County contends, "HHS's decision to adopt the unlawful criteria in the 2018 Tier 1 FOA is unequivocal and imposes significant legal and practical consequences on both the County and the agency." ECF #58, at 7.

Indeed, the 2018 Tier 1 FOA plainly states:

> We will review your application to determine whether it meets the following responsiveness criteria. *If your application does not meet the responsiveness criteria, we will eliminate it from the competition and it will not be reviewed.*

AR000060 (emphasis added). As part of the responsiveness criteria, an applicant must demonstrate that "[o]ne of the two eligible programs is clearly identified," i.e., the Systematic Method for Assessing Risk-avoidance Tool ("SMARTool") and the Tool to Assess the Characteristics of Effective Sex and STD/HIV Education Programs ("TAC").[6] AR000043–44, 60. The 2018 Tier 1 FOA elsewhere reiterates that if the application fails to meet the responsiveness criteria, "it will **not** be reviewed and will receive **no** further consideration." AR000061–62 (emphasis in original). No appeals are allowed. AR000094.

Thus, the 2018 Tier 1 FOA unequivocally makes clear that if an application fails to identify "one of the two eligible programs," "it will **not** be reviewed and will receive **no** further consideration." AR000043–44, 61–62. This eligibility requirement, which by its terms

---

[6] These "programs" and the legality of the 2018 Tier 1 FOA are discussed further in the Merits section, *infra*, Part IV.B.5.

eliminates an application from contention, amounts to the agency's "last word on the matter." Waiting to see which projects are actually funded before calling this a final agency action would force the County to engage in a futile exercise that would not put the parties in any meaningfully different posture than the one they are in now. Following such an approach would improperly disregard the "effect of the action" and fail to interpret finality in a pragmatic way. *Oregon Nat. Desert*, 465 F.3d at 985.

Defendants also fail to acknowledge that the 2018 Tier 1 FOA is the consummation of HHS's decision-making process. Before drafting the 2018 Tier 1 FOA, HHS "reviewed the rigorous evaluation studies of the TPP Program." Reply to Senator Murray, AR000442; *see also* Summary of Findings from TPPP Grantees, Tier 1 (FY2010–2014), AR000024. In a press release dated August 28, 2017, HHS announced that "[t]he evidence tells us that most of these programs are not working," "[c]ontinuing the TPP Program as it is currently structured would be a waste of taxpayer money," and it was "precisely for this reason that HHS chose to end the [current] implementation of the TPP Program." AR000029. That HHS engaged in this decision-making process further demonstrates that the 2018 Tier 1 FOA is its last word on eligibility criteria for TPP funding in fiscal year 2018. *See Whitman*, 531 U.S. at 479 ("Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final."). Again, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin*, 505 U.S. at 797; *see also California ex rel. Harris v. Fed. Hous. Fin. Agency*, No. C 10-03084 CW, 2011 WL 3794942, at *10 (N.D. Cal. Aug. 26, 2011) (finding first prong of *Bennett* test had been satisfied on motion to dismiss where agency presented statement at issue as "the consummation of a decision-making process

that involved careful review and over a year of working with federal and state government agencies") (internal quotation marks omitted).

The second prong of the *Bennett* test is easily satisfied. Legal consequences flow from HHS's decision to deny federal funding to applicants who do not identify "one of the two eligible programs." *See Arizona State Bd.*, 391 F. Supp. 2d at 802 (legal consequences flow from an agency's decision that prohibits future federal funding); *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 60 (D.D.C. 2015) ("it is clear beyond cavil that the rejection of a request for a government benefit . . . 'fixes some legal relationship' between a private party and the government").[7]

Remarkably, defendants contend that "[e]ligibility is not contingent on *compliance* with th[e] requirement" that an application identifies "one of the two eligible programs" in the 2018 Tier 1 FOA. ECF #73, at 5 (emphasis in original). This ignores repeated statements in the 2018 Tier 1 FOA to the contrary, specifically that "OAH will fund projects that will replicate one of the two effective programs described in the summary," "[p]rojects are required to replicate a risk avoidance model or a risk reduction model that incorporates the common characteristics outlined in one of the two programs," and "[o]ne of the two eligible programs" must be "clearly identified" or OAH "will eliminate it from the competition and it will not be reviewed." AR000035,43–60. Defendants also contend that "[t]he identification requirement determines only whether the application is reviewed as an SRA [(sexual risk avoidance)] or an SSR [(sexual

---

[7] Moreover, under HHS regulations, the eligibility criteria in the 2018 Tier 1 FOA are binding. *See* 45 C.F.R. § 75.203(c)(3) ("The HHS awarding agency must include . . . [s]pecific eligibility information, including any factors or priorities that affect an applicant's or its application's eligibility for selection."); *id.* Pt. 75, App. I (C)(3) (discussing requirements of "criteria that make particular projects ineligible" and how "HHS agencies should make clear whether an applicant's failure to meet an eligibility criterion . . . will preclude the HHS awarding agency from making a Federal award").

risk reduction)] project."  ECF #73, at 5.  However, sexual risk avoidance and sexual risk

reduction are at the core of the only "eligible programs" that may be considered under the 2018

Tier 1 FOA:  the SMARTool, which describes "elements essential for effective sexual risk

avoidance," and the TAC, which describes "elements of effective sexual risk reduction."

AR000043.

Other courts have found that "final agency action" exists under circumstances analogous

to those in this case.  For example, in *Nat'l Min. Ass'n v. Jackson*, the court held that the

Environmental Protection Agency's ("EPA") process and guidance memoranda regarding

permitting under the Clean Water Act contained "unequivocal requirements" regarding the

screening of permit applications and therefore constituted a final agency action.  768 F. Supp. 2d

34, 44 (D.D.C. 2011).  The court noted that "[t]he federal defendants' view of what amounts to

finality is too narrow, as it is possible for an agency to take final agency actions during a permit

assessment process prior to actually determining whether to grant or deny an application for a

permit."  *Id.*  The EPA's materials had a "practical effect" upon permit applications, and the

finality requirement had to be interpreted in a "pragmatic way."  *Id.*; *see also XP Vehicles*, 118 F.

Supp. 3d at 59 ("ripeness doctrine does not require that an agency reach and determine the

underlying merits of an application or petition—as distinguished from making a determination

regarding initial eligibility criteria—so long as the agency has made a final and unequivocal

decision with respect to what it does review"); *Jafarzadeh v. Nielsen*, No. CV 16-1385 (JDB),

2018 WL 3732130, at *12–13 (D.D.C. Aug. 6, 2018) (holding that 2008 memorandum creating

the Controlled Application Review and Resolution Program ("CARRP") "clearly represents the

consummation of the agency's decision-making on the question of how to handle applications of

individuals with national security concerns").

The holding in *Nat'l Min. Ass'n* follows well-established precedent in the District of Columbia Circuit. *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (holding that a guidance document constituted final agency action, "reflecting a settled agency position which has legal consequences both for State agencies administering their permit programs and for companies like those represented by petitioners who must obtain Title V permits in order to continue operating"); *CropLife Am. v. E.P.A.*, 329 F.3d 876, 883 (D.C. Cir. 2003) (holding that a directive in a press release was more than a mere policy statement, and clearly established a substantive rule declaring that third-party human studies were deemed immaterial in EPA regulatory decision making under FFDCA and FIFRA). Courts from other circuits have issued similar rulings. *See*, *e.g.*, *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332, 346 (S.D.N.Y. 2015) (holding that regulations, which established a framework by which Department of Education would evaluate programs with the ultimate goal of confining eligibility for federal financial aid, constituted final agency action); *Wagafe v. Trump*, No. C17-0094-RAJ, 2017 WL 2671254, at *10 (W.D. Wash. June 21, 2017) (holding that the CARRP policy was a final agency action).

Defendants seize on language in *Rattlesnake Coal. v. EPA*, where the Ninth Circuit stated that an agency "does not take a final agency action until it completes its review of the grant application and decides to disburse the appropriate funds." 509 F.3d 1095, 1104 (9th Cir. 2007). Defendants ignore the facts in *Rattlesnake* that make it inapposite. *Id.* at 1104. There, a third-party plaintiff sued the EPA and a future grantee to prevent the EPA from disbursing funds for construction on a wastewater treatment facility until the EPA complied with the National Environmental Policy Act. *Id.* at 1099. When the plaintiff brought suit, Congress had appropriated funding for the construction project, but the EPA had not yet disbursed funds to the

grantee. The plaintiff argued that where Congress earmarks federal funds for a particular project via an appropriations act, the funds should be considered dispersed and qualify as a final agency action. *Id.* at 1103. The Ninth Circuit disagreed for two reasons. First, the court noted that Congress is not an "agency" under the APA. Second, the court stated that "[e]ven where, as here, Congress has specified the specific project to which funds should be allocated, the EPA does not take a final agency action until it completes its review of the grant application and decides to disburse the appropriated fund." *Id.* Importantly, however, the court noted that "[b]efore disbursal of the funds, the EPA could decide to issue an EA [(environmental assessment)] and a FONSI [(finding of no significant impact)] or an EIS [(environmental impact statement)]." *Id.* Absent this final agency decision, there was no jurisdiction to review the claim. *Id.*

Unlike *Rattlesnake*, the 2018 Tier 1 FOA leaves no room for additional agency action. Rather, the 2018 Tier 1 FOA unequivocally states that those applicants who fail to identify "one of the two eligible programs" "will **not** be reviewed and will receive **no** further consideration," and no appeals are allowed. AR000061–62 (emphasis in original). There is no further potential agency action that would render a denial based on these threshold eligibility criteria more "final."

Defendants' reliance on *Planned Parenthood of Wisconsin, Inc. v. Azar*, No. 1:18-CV-01035 (TNM), 2018 WL 3432718 (D.D.C. July 16, 2018), is also misplaced. ECF #73, at 3–4. That case involved an HHS funding opportunity announcement for grants under Title X of the Public Health Service Act. The court held there was no final agency action because the announcement applied only to an intermediate stage in the review process. *Id.* at *9. The "case involve[d] scoring criteria, not eligibility criteria," and the ultimate decision about whether a

grant would be awarded was vested in the discretion of the Deputy Assistant Secretary.  *Id.* at

**6, 8.  This case, on the other hand, involves threshold eligibility criteria and unequivocal

language in the 2018 Tier 1 FOA that applicants who do not identify "one of the two eligible

programs" "will **not** be reviewed and will receive **no** further consideration."  AR000061–62

(emphasis in original).

 *Citizens Alert Regarding Env't v. E.P.A.*, another case cited by defendants, is similarly

distinguishable.  There, the plaintiffs sought injunctive relief against the construction of a sewer

line on the basis that it failed to comply with the National Environmental Policy Act ("NEPA").

The court noted that the EPA was in the process of "conducting the review required by NEPA in

association with the proposed grant, and ha[d] issued proposed findings, but ha[d] not yet made a

final determination as to the environmental effects of the [project], or on whether to award the

grant."  102 F. App'x 167, 168 (D.C. Cir. 2004).  The court held that there could be no final

agency action until the EPA completed its review and reached a funding decision.  *Id.*  Here,

again, there is no further action, discretionary or otherwise, that HHS would engage in before

rejecting an application on the basis of the bright-line threshold eligibility criteria in the 2018

Tier 1 FOA.  The threshold eligibility criteria are the agency's "last word" on whether an

application will be reviewed.

 In their reply, defendants refer to the APA's definition of "relief" and suggest that it

somehow supports the conclusion that a grant must be awarded before there can be relief.  ECF

#73, at 4.  "Agency action" is defined in the APA to include "the whole or a part of an agency

rule, order, license, sanction, *relief*, or the equivalent or denial thereof, or failure to act."  5

U.S.C. § 551(13) (emphasis added).  Relief includes "the whole or a part of an agency . . . grant

of money, assistance, license, authority, exemption, exception, privilege, or remedy."  5 U.S.C.

§ 551(11)(A). Defendants' argument is unpersuasive. Under the 2018 Tier 1 FOA, if an application is rejected for failing to meet the threshold eligibility requirements, there will be no grant of money, i.e., no relief.

Finally, at oral argument, HHS tried to make the distinction that unlike in *Becerra*, there is no requirement that the County certify compliance with the government's interpretation of a federal statute. This distinction is not material. In *Becerra*, the federal government required applicants for certain law enforcement grants to certify compliance, under penalty of perjury, with the government's interpretation of a federal law regarding communications between government agencies and the Immigration and Naturalization Service. 284 F. Supp. 3d at 1023. The court found that the government's imposition of a compliance condition was a final agency action; the second prong of the *Bennett* test was satisfied because receipt of grants was conditioned on compliance with the certification condition. *Id.* at 1031–32. The lack of a certification requirement here does not change the fact that 2018 Tier 1 FOA contains threshold eligibility criteria from which legal consequences flow. This is simply a different form of final agency action.

### B. Committed to Agency Discretion by Law

There is a "'strong presumption that Congress intends judicial review of administrative action.'" *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015) (quoting *Helgeson v. Bureau of Indian Affairs*, 153 F.3d 1000, 1003 (9th Cir. 1998); *see also Traynor v. Turnage*, 485 U.S. 535, 542 (1988). "This presumption is overcome only in two narrow circumstances: (1) when Congress expressly bars review by statute, or (2) where an 'agency action is committed to agency discretion by law.'" *ASSE Int'l*, 803 F.3d at 1068 (first citation and quotation marks omitted) (quoting 5 U.S.C. § 701(a)(2)); *Traynor*, 485 U.S. at 542 ("The presumption in favor of

judicial review may be overcome only upon a showing of clear and convincing evidence of a contrary legislative intent.").

"Agency action is committed to agency discretion in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply, thereby leaving the court with no meaningful standard against which to judge the agency's exercise of discretion." *ASSE Int'l*, 803 F.3d at 1068 (citation and quotation marks omitted). The Supreme Court has read Section 701(a)(2) "to preclude judicial review of certain categories of administrative decisions," for example, administrative decisions regarding the "allocation of funds from a lump-sum appropriation" where the decision "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (citations and internal quotation marks omitted). However, "the mere fact that a statute contains discretionary language does not make agency action unreviewable." *ASSE Int'l*, 803 F.3d at 1068 (quoting *Beno v. Shalala*, 30 F.3d 1057, 1066 (9th Cir. 1994)).

Defendants argue the 2018 Tier 1 FOA is not subject to judicial review because it reflects grant-making policy preferences that are committed to agency discretion. ECF #42, at 14. Specifically, defendants contend there are no judicially manageable standards to evaluate the policy criteria HHS uses to administer funds where the statute leaves those criteria to the agency's discretion. *Id.* at 15–16.

"[T]o assess whether the court has a 'meaningful standard against which to judge the agency's exercise of discretion[,]' we first look at the statute itself." *ASSE Int'l*, 803 F.3d at 1068 (quoting *Helgeson*, 153 F.3d at 1003) (original alterations omitted). The 2018 CAA provides that "$101,000,000 shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and

for the Federal costs associated with administering and evaluating such contracts and grants. . . ." 132 Stat. at 733. If this was the end of it, HHS's reliance on *Lincoln*, *Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025, 1038 (9th Cir. 2013), *Serrato v. Clark*, 486 F.3d 560, 568 (9th Cir. 2007), and *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002), among other cases, might be well placed. In those cases, Congress allocated funds to lump-sum appropriations without specifically restricting the use of funds. *See Lincoln*, 508 U.S. at 185 (holding appropriations statute requiring agency to "expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians for the relief of distress and conservation of health" committed expenditure to agency discretion); *Los Coyotes*, 729 F.3d at 1038 ("The Tribe does not identify any specific appropriation it believes should have been allocated for law enforcement on the reservation, let alone specific language in an appropriation that deprives the Secretary the discretion to allocate the funds."); *Serrato*, 486 F.3d at 569 (holding Congress's use "of the word 'may,' did not mandate that the program operate continuously" and therefore the decision to terminate the program was not susceptible to judicial review); *Milk Train*, 310 F.3d at 751 (holding appropriations statute with language "in a manner determined appropriate by the Secretary[,]" was committed to agency discretion and "left to the Secretary's sole judgment").

However, the 2018 CAA contains additional, specific mandates as follows:

> . . . not more than 10 percent of the available funds *shall be* for training and technical assistance, evaluation, outreach, and additional program support activities, and of the remaining amount 75 percent *shall be for replicating programs that have been proven effective through rigorous evaluation* to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, and 25 percent *shall be* available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy.

132 Stat. at 733 (emphasis added).  These mandatory limitations afford a "statutory reference point" by which the court can review the 2018 Tier 1 FOA.  Therefore, the presumption for judicial review of the 2018 Tier 1 FOA has not been overcome.

## IV.  Merits

Having concluded that this case is reviewable under the APA, the court turns to the merits of the parties' cross-motions for summary judgment.  ECF ##29, 42.  A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where the questions are purely legal in nature, a court can resolve a challenge to a federal agency's action on a motion for summary judgment.  *Fence Creek Cattle Co v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

### A.  *Skidmore* **Deference**

Defendants argue that HHS's interpretation of its authority under the TPP Program appropriation is entitled to deference.  ECF #42, at 21.  Under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), and *United States v. Mead Corp.*, 533 U.S. 218 (2001), "an agency's ruling is eligible to claim respect according to its persuasiveness."  *Seaview Trading, LLC v. Comm'r of Internal Revenue*, 858 F.3d 1281, 1285–86 (9th Cir. 2017) (internal quotation omitted); *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 832 (9th Cir. 2012).

However, "if the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–843 (1984).  Here, as discussed in detail below, Congress spoke unambiguously when it required HHS to use the Tier 1 appropriation to "replicate programs that have been proven effective through rigorous

evaluation." Therefore, HHS's interpretation of the 2018 CAA is not entitled to any deference. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) (finding that there is "no need to choose between *Skidmore* and *Chevron* " where the statute is clear); *De Leon-Ochoa v. Attorney Gen. of U.S.*, 622 F.3d 341, 355 (3d Cir. 2010) ("Without the necessity of resorting to *Chevron* or even *Skidmore* deference, we determine that Congress spoke unambiguously when it required that TPS applicants demonstrate continuous residency from the date designated by the Attorney General and continuous physical presence from the most recent designation.").

### B. Count One

In Count One, the County asks the court to set aside the 2018 Tier 1 FOA because it is "not in accordance with law" under the APA; specifically, it violates the 2018 CAA, the Purpose Statute, and the Appropriations Clause. ECF #28, at 35.

#### 1. Applicable Law

Under the APA, the "reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or *otherwise not in accordance with law*." 5 U.S.C. § 706(2)(A) (emphasis added). An agency's action can be upheld only on the basis of the reasoning in its decision. *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004). "[A] court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (internal citations and quotation marks omitted).

Nonetheless, Courts need not decide whether the agency engaged in reasoned decision-making or whether the agency's action was supported by the reasons proffered when that action is outside the scope of its lawful authority. *See Michigan v. E.P.A.*, 135 S. Ct. 2699, 2706,

(2015) (citing *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 374 (1998)) ("an agency's decreed result [must] be within the scope of its lawful authority"); *see also Nat. Res. Def. Council v. EPA*, 777 F.3d 456, 469 (D.C. Cir. 2014) (finding that an agency's action "untethered to Congress's approach" must be vacated); *Friedler v. Gen. Servs. Admin.*, 271 F. Supp. 3d 40, 61 (D.D.C. 2017) (finding an agency has "acted arbitrarily and capriciously, no matter how well-reasoned and seemingly well-supported its ultimate conclusion might be" when it violates its own regulations); *City of Los Angeles*, 293 F. Supp. 3d at 1100 (finding agency's action to be arbitrary and capricious as a matter of law when agency lacked authority to impose the action).

The Purpose Statute, 31 U.S.C. § 1301(a), provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." The Appropriations Clause, contained in Article I, section 9, of the Constitution, states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law. . . ." U.S. Const., art. I, § 9, cl. 7. Article I, section 8, of the Constitution further grants Congress the "[P]ower To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States. . . ." U.S. Const. art. I, § 8, cl. 1.

"Article I grants this power to Congress, and Congress alone." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 638 (2017). "Nothing in Article II of the Constitution provides the Executive with any independent authority to spend, or withhold, federal funds that Congress has appropriated. Rather, the Executive is obligated to 'take Care that the Laws be faithfully executed.'" *Id.* (quoting U.S. Const. art. II, § 3). The Appropriations Clause was designed to "assure that public funds will be spent according to the letter of the difficult judgments reached

by Congress as to the common good and not according to the individual favor of Government agents." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990); *see also Chevron, U.S.A.*, 467 U.S. at 842–43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); 21 *Appropriation-Contracts.*, 21 U.S. Op. Atty. Gen. 414 (1896) ("If the appropriations are not used for the particular work designated by Congress they cannot be used for any other purpose").

### 2.    2018 Tier 1 FOA

The 2018 Tier 1 FOA identifies two tiers:  "Tier 1, in which grantees are required to replicate a program and Tier 2, in which grantees are required to test new and innovative strategies."  AR000034.  The 2018 Tier 1 FOA "solicits applications for Tier 1 projects to replicate and scale up one of two programs that include the protective factors shown to be effective in preventing teen pregnancy and/or sexual risk behaviors with youth."  *Id.*  The "two programs" are limited to the SMARTool and the TAC.  AR000034–35.  "Curriculum must be selected . . . to address and replicate each of the elements in one of the two programs," specifically the nine elements of effective sexual risk avoidance (SRA) projects in the SMARTool and the 17 elements of effective sexual risk reduction (SRR) projects in the TAC.  AR000043–44.

"Strategies to address protective factors can take a risk avoidance approach or a risk reduction approach," and "[p]rojects are required to replicate a risk avoidance model or a risk reduction model that incorporates the common characteristics outlined in one of the two programs."  AR000035, 44.  Those approaches that identify as risk avoidance should replicate the SMARTool and those that identify as risk reduction should replicate the TAC.  AR000045.

Projects on a continuum may select either the SMARTool or TAC, but "must describe in detail how they replicate each element of one of the two programs." *Id.*

### 3. SMARTool

Published in 2010, the SMARTool "is a research-based tool designed to help organizations assess, select, and implement effective programs and curricula that support sexual risk avoidance." ECF #33-24, at 6. The SMARTool identifies nine elements of effective sexual risk avoidance projects:

> (1) enhance knowledge of physical development and sexual risks and personal relationships,
> (2) support personal attitudes and beliefs that value sexual risk avoidance,
> (3) acknowledge and address common rationalizations for sexual activity,
> (4) improve perception of and independence from negative peer and social norms,
> (5) build personal competencies and self-efficacy to avoid sexual risk,
> (6) strengthen personal intention and commitment to avoid sexual activity,
> (7) identify and reduce the opportunities for sexual activity,
> (8) strengthen future goals and opportunities, and
> (9) partner with parents.

ECF #33-24, at 14; AR000043.

### 4. TAC

The TAC is "an organized set of questions designed to help practitioners assess whether curriculum-based programs have incorporated the common characteristics of effective programs." ECF #33-23, at 1–2. The TAC relies on a research study completed in 2006 to identify the common characteristics of effective sex and HIV education programs. *Id.* The TAC was first published in 2007 and re-released in 2014. *Id.* at 2. Thus, it predates the creation of the TPP Program and the TPP Evidence Review. The TAC is designed primarily to help "select effective programs." *Id.* at 4. Specifically, it is designed to assess and select curricula, adapt selected curricula, develop new curricula, and implement curricula that incorporates the characteristics of effective programs. *Id.* at 5.

The TAC identifies 17 characteristics of effective programs:

1. Involved multiple people with different backgrounds in theory, research and sex and STD/HIV education to develop the curriculum.
2. Assessed relevant needs and assets of target group.
3. Used a logic model approach to develop the curriculum that specified the health goals, the behaviors affecting those health goals, the risk and protective factors affecting those behaviors, and the activities addressing those risk and protective factors.
4. Designed activities consistent with community values and available resources (e.g., staff time, staff skills, facility space and supplies).
5. Pilot-tested the program.
6. Focused on clear health goals — the prevention of STD, HIV and/or pregnancy.
7. Focused narrowly on specific behaviors leading to these health goals (e.g., abstaining from sex or using condoms or other contraceptives), gave clear messages about these behaviors, and addressed situations that might lead to them and how to avoid them.
8. Addressed multiple sexual psychosocial risk and protective factors affecting sexual behaviors (e.g., knowledge, perceived risks, values, attitudes, perceived norms and self-efficacy).
9. Created a safe social environment for youth to participate.
10. Included multiple activities to change each of the targeted risk and protective factors.
11. Employed instructionally sound teaching methods that actively involved the participants, that helped participants personalize the information, and that were designed to change each group of risk and protective factors.
12. Employed activities, instructional methods and behavioral messages that were appropriate to the youths' culture, developmental age and sexual experience.
13. Covered topics in a logical sequence.
14. Secured at least minimal support from appropriate authorities such as ministries of health, school districts or community organizations.
15. Selected educators with desired characteristics (whenever possible), trained them, and provided monitoring, supervision and support.
16. If needed, implemented activities to recruit and retain youth and overcome barriers to their involvement (e.g., publicized the program, offered food or obtained consent).
17. Implemented virtually all activities with reasonable fidelity.

*Id.* at 10; AR000043–44.

### 5.     The County's Claims

The County's claims can be summarized in two broad categories: (1) the 2018 Tier 1

FOA fails to follow the mandate of the 2018 CAA because it limits funding to projects that

replicate elements of the SMARTool and TAC, which are not "programs that have been proven effective through rigorous evaluation"; and (2) the 2018 Tier 1 FOA illegally allocates a portion of Tier 1 funding to Tier 2 and augments the Sexual Risk Avoidance Education Program ("SRAEP").

        **a.**        **The SMARTool and TAC—Not Programs Under the 2018 CAA**

The SMARTool and TAC are not programs, much less ones that have been proven effective through rigorous evaluation. The analysis begins with the language of the 2018 CAA, specifically the mandate that "75% shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Where "'a word is not defined by statute, [courts] normally construe it in accord with its ordinary or natural meaning'" and "may refer to standard English language dictionaries" to do so. *United States v. Ezeta*, 752 F.3d 1182, 1185 (9th Cir. 2014) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)). The dictionary definition of "replicate" is to duplicate, i.e., be "exactly the same as one or more others of its kind." *Replicate*, WEBSTER'S NEW INTERNATIONAL DICTIONARY, UNABRIDGED 1925 (3d ed. 1971) ("WEBSTER'S THIRD"); *Duplicate*, WEBSTER'S THIRD at 702. The dictionary definition of "program" is "a schedule or system under which action may be taken toward a desired goal." WEBSTER'S THIRD at 1812. "Rigorous" is defined as "extremely thorough, exhaustive, or accurate." *Id.* at 1957. Synonyms include meticulous, conscientious, diligent, careful, painstaking, demanding, and exacting. *Rigorous*, ENGLISH OXFORD LIVING DICTIONARIES, https://en.oxforddictionaries.com/thesaurus/rigorous (last visited Aug. 28, 2018); *see also Rigorous*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/

thesaurus/rigorous (last visited Aug. 28, 2018) (including synonyms scrupulous, accurate, exact, and precise).

Defendants contend that a program is defined as "simply any 'plan or system under which action may be taken toward a goal.'" This definition is essentially no different from the one set forth above or the one proffered by the County.[8] ECF #42, at 18. Under either definition, the SMARTool and TAC are not programs. The SMARTool is defined as "a research-based *tool* designed to help organizations assess, select, and implement effective programs." ECF #33-24, at 6 (emphasis added). The TAC, which is an acronym for *Tool* to Access the Characteristics of Effective Sex and STD/HIV Education Programs, is "an organized set of questions designed to help practitioners assess whether . . . programs have incorporated the common characteristics of effective programs." ECF #33-23, at 1–2 (emphasis added). A non-exhaustive list of questions, elements, or characteristics designed to help organizations assess, select, and implement programs does not constitute a plan or system under which action may be taken toward a goal. Otherwise stated, the SMARTool and the TAC are self-described tools used to select effective programs; as such, they are not effective programs in and of themselves.[9]

Moreover, the 2018 Tier 1 FOA requires applicants to "replicate each of the elements" of the SMARTool or TAC. AR000043. An element is only a "part" or "component" of the whole. *See Element,* DICTIONARY.COM, https://www.dictionary.com/browse/element?s=t (last visited Aug. 28, 2018) ("a component or constituent of a whole or one of the parts into which a whole

---

[8] The County contends that a program is defined as a "planned, coordinated group of activities, processes, and procedures designed to achieve a specific purpose." ECF #59, ¶ 16(a).

[9] In fact, the TAC explains that the "most promising approach is to review those curricula that have previously been demonstrated to be effective with populations of youth similar to [the target population] and that match the needs and resources of [the target] community and then to select one." ECF #33-23, at 5.

may be resolved by analysis"). Adopting defendants' approach would be directly at odds with the mandate of the 2018 CAA, which requires that whole programs—not merely elements—be replicated.

HHS also ignores the qualifier that the programs must be "proven effective by rigorous evaluation." Defendants have offered no evidence that any program has ever been developed using the SMARTool or the TAC, let alone that such a program has been evaluated or resulted in a study demonstrating evidence of effectiveness.[10] Additionally, the 2018 Tier 1 FOA allows "[a]pplicants [to] choose *any curriculum* as long as it incorporates all of the evidence-based elements of either the" SMARTool or TAC. ECF #33-22, at 3 (emphasis added). As the County aptly notes, this means that "all projects incorporating these elements, *however cobbled together*, will necessarily" be eligible for funding. ECF #58, at 16 (quotations and brackets omitted) (emphasis added). Moreover, as the County importantly observes, "[n]othing in the new FOA prevents Defendants from funding programs that have already been proven *ineffective*, provided they echo the elements in the TAC or the SMARTool." ECF #58, at 19 (emphasis added).

The County contends that additional scoring criteria contained in the 2018 Tier 1 FOA is similarly problematic. The 2018 Tier 1 FOA states that points may be awarded for weaving the goal of optimal health into every component of the project, clearly communicating that teen sex is a risk behavior, providing skills to avoid risk, and providing cessation support. AR000090–91 ("Project Expectations and Priorities"). However, nothing in the record indicates that fulfilling these requirements has ever resulted in a program proven effective through rigorous evaluation.

---

[10] While the authors of the TAC state "programs that incorporate all these characteristics are quite likely to reduce sexual risk-taking," ECF #33-23, at 5, HHS has not identified a single study showing that this is, in fact, the case.

In sum, "an agency is not free simply to disregard statutory responsibilities. . . ." *Lincoln*, 508 U.S. at 193. Implementation of the 2018 Tier 1 FOA would fail to "distribute funds among some or all of the permissible objects" specified by Congress. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861, 861 n.5 (D.C. Cir. 1984) (internal citation omitted). Because the 2018 Tier 1 FOA is "not in accordance with law," it must be vacated. 5 U.S.C § 706(2)(A).

### b. Impermissible Use of 75% Allocation

The County also contends that the 2018 Tier 1 FOA improperly transfers a portion of the 75% that is earmarked for replicating programs toward the 25% of funds dedicated to "research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy," i.e., from Tier 1 grants to Tier 2 grants. Indeed, the 2018 Tier 1 FOA contains language indicating that the funds will not be used solely for replicating programs. For instance, the 2018 Tier 1 FOA states that "[t]he purpose of this funding opportunity is to fund *the evaluation of replication strategies* that focus on protective factors." AR000048 (emphasis added). Clearly, evaluating replication strategies is distinguishable from replicating programs themselves. Elsewhere, the 2018 Tier 1 FOA requires applicants to provide "a *proposal* for rigorous evaluation and testing." *Id*. at 4, 19 (emphasis added). However, there would be no need to submit a proposal to rigorously evaluate and test programs if they have already been "proven effective through rigorous evaluation."

Moreover, as the County accurately observes, "the stated purpose of the 2018 Tier 1 FOAs is identical to that of the 2018 Tier 2 FOA, save for the deletion of the word 'replication.'" ECF #29, at 21. Indeed, the stated purpose of the 2018 Tier 2 FOA is "to fund the evaluation of strategies that focus on protective factors shown to prevent teen pregnancy, improve adolescent

health and address youth sexual risk holistically," while the purpose of the 2018 Tier 1 FOA is "to fund the evaluation of replication strategies that focus on protective factors shown to prevent teen pregnancy, improve adolescent health, and address youth sexual risk holistically." AR000048, 000139. Because the 2018 Tier 1 FOA is not limited to replicating programs proven effective through rigorous evaluation and instead directs funds towards Tier 2 research and evaluation efforts, it violates the 2018 CAA, the Purpose Statute, and the Appropriations Clause. The 2018 Tier 1 FOA further violates the 2018 CAA in that it allows for misappropriation in excess of this transfer limit. 2018 CAA, 132 Stat. at 736.

Defendants contend that the 2018 Tier 1 FOA contains language that is no different from "similar requirements" contained in the 2010 and 2015 FOAs. ECF #42, at 23. For example, the 2010 Tier 1 FOA states that "OAH plans for a mixture of evaluation strategies to address the question of whether replications of evidence-based programs are effective" and that "all grantees will be expected to monitor and report on program implementation and outcomes through performance measures." 2010 Tier 1 FOA, ECF #33-3, at 11. Defendants misconstrue the nature of the 2010 Tier 1 FOA requirements, as they do not conflict with the appropriation's mandate to replicate programs proven effective through rigorous evaluation. The 2010 Tier 1 FOA merely informed applicants that their performance would be evaluated in terms of whether their replications of evidence-based programs were effective. Whether the replication of a program was effective is a different inquiry than whether a program has previously been proven effective through rigorous evaluation. Here, as discussed at length above, requiring applicants to choose from elements of a "sexual risk reduction" or a "sexual risk avoidance" approach, when no such program has ever existed or been implemented before, necessarily conflicts with the

appropriation's mandate that Tier 1 funds "shall be for replicating programs that have been proven effective through rigorous evaluation."

The County also argues, but this time to no avail, that the 2018 Tier 1 FOA repurposes the Tier 1 appropriation to expand the funding pool for SRA grants under the SRAEP. ECF #29, at 21-22; ECF #58, at 20. In addition to appropriating funds to Tier 1 and Tier 2 grants, the 2018 CAA contains a separate provision appropriating $25 million "for making competitive grants which exclusively implement education in sexual risk avoidance (defined as voluntarily refraining from non-marital sexual activity)." 2018 CAA, 132 Stat. at 733.

The County contends that because the 2018 Tier 1 FOA requires that projects "clearly communicate risk," "provid[e] skills to avoid sexual risk," and incorporate messages of "optimal health" and "cessation support," the 2018 Tier 1 FOA unlawfully transfers funds from Tier 1 to SRA education programs. ECF #58, at 20; AR000045–16. However, as the 2018 CAA's Tier 1 and SRA appropriations are not mutually exclusive, the 2018 Tier 1 FOA does not violate the Purpose statute as the County contends. The 2018 CAA requires Tier 1 funds be used to "replicate programs proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors." Other than that, it does not mandate specific subject matter. That this argument fails, however, does nothing to save the 2018 Tier 1 FOA as it is unlawful for the many other reasons discussed above.

### C.    Counts Two and Three

Counts Two and Three also allege APA violations. In Count Two, the County contends that the 2018 Tier 1 FOA is arbitrary and capricious and an abuse of discretion for three reasons: (1) defendants did not provide a reasoned explanation for the changes to the criteria in the 2018

Tier 1 FOA and for the FOA's departure from the statute and past agency practice; (2) the criteria in the 2018 Tier 1 FOA run counter to the evidence before the agency; and (3) defendants prejudged the 2018 TPP Program competition with an unalterably closed mind and designed the 2018 Tier 1 FOA as a pretext for ending the TPP Program based on preconceived ideological animus. ECF #28, ¶¶ 107–110; ECF #29, at 27. In Count Three, the County contends that the 2018 Tier 1 FOA is contrary to an HHS regulation, 45 C.F.R. § 87.3(l), which provides that "[d]ecisions about awards of Federal financial assistance must be free from political interference or even the appearance of such interference and must be made on the basis of merit, not on the basis of the religious affiliation, or lack thereof, of a recipient organization." ECF #28, ¶ 113. The County argues that "[s]ince at least February 2017, Defendants have engaged in impermissible political interference in multiple aspects of the administration of TPP Program grants, including but not limited to the cancellation of the 2015 TPP Program grants and the drafting and administration of the 2018 Tier 1 FOA." ECF #28, ¶ 114. It further contends that "[t]he 2018 Tier 1 FOA has been designed to disadvantage applicants who do not share a particular, religiously affiliated view of sex education." *Id.* ¶ 115.

This court's decision on Count One is sufficient to vacate the 2018 Tier 1 FOA, as the County has requested. Having already concluded the 2018 Tier 1 FOA is "otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A), this court need not reach the County's alternative grounds. Moreover, this matter will be remanded to HHS, and the agency's future conduct may resolve these issues or possibly raise others. *See* WRIGHT & MILLER, FED. PRAC. &

PROC. § 3533 (3d ed.).[11]  As such, it is advisable to refrain from addressing the litany of contentious issues raised in Counts Two and Three.

### D.    Count Four

An agency "has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  When agencies "act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires."  *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297 (2013).  The *ultra vires* doctrine is applicable in the grantmaking context to enjoin an agency that exceeds its authority in changing grant criteria dictated by Congress.  *See City of Los Angeles*, 293 F. Supp. 3d at 1098 (finding agency imposition of grant considerations not authorized by Congress was "ultra vires as a matter of law").

Here, defendants lack authority to disregard Congress's mandate that Tier 1 funds "shall be for replicating programs that have been proven effective through rigorous evaluation," 2018 CAA, 132 Stat. at 733, and to instead direct funds to programs that do not meet that requirement. Defendants argue they have acted within the broad scope of the 2018 CAA to reassess the TPP Program and issue new funding criteria, ECF #42, at 25, but that is clearly not the case for the reasons discussed above.  Thus, the 2018 Tier 1 FOA is an *ultra vires* agency action as a matter of law and also must be vacated on that ground.

---

[11] Additionally, the parties asked for "expedited consideration" of these motions and a ruling by August 31, 2018.  ECF #26.

**ORDER**

The County's motion for summary judgment (ECF #29) with respect to Counts One and Four is granted, and defendants' motion for summary judgment (ECF #42) on those claims is denied. The County's motion for preliminary injunction (ECF #29) is denied as moot. The motions for summary judgment (ECF ##29, 42) regarding Counts Two and Three are also denied as moot.

The 2018 Tier 1 FOA is vacated. The parties shall confer and submit to the court by September 14, 2018, a proposed order suspending the lapse provision and extending the term of budget authority.

DATED  August 30, 2018.

/s/ Youlee Yim You
_____
Youlee Yim You
United States Magistrate Judge